IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No. 16-10018-01-JTM

STEVEN R. HENSON,

Defendant.

**MEMORANDUM AND ORDER**

This matter came before the court on June 2, 2017, for a hearing on pending motions. The court ruled orally on several of the motions at the hearing. This written memorandum will supplement the court's oral rulings.

1. Defendant's Motion in Limine to exclude hearsay testimony (Dkt. 97). In view of the parties' representations at the hearing, the court finds this motion is moot.

2. Defendant's Motion in Limine to admit evidence of mandatory minimum sentence (Dkt. 98). Defendant argues the jury should be informed of the mandatory twenty-year minimum sentence applicable to Count 17 (21 U.S.C. § 841(b)(1)(C)), because the traditional rule barring such evidence is "anachronistic" when a mandatory sentence in involved. Dkt. 98 at 3. He contends that 1 U.S.C. § 112 makes such evidence admissible and that jurors must "be allowed to read for themselves the text of the statute on which they are asked to find guilt." *Id.* at 4.

The Supreme Court and the Tenth Circuit have both stated that when a jury has no sentencing function, the jury should reach a verdict without regard to what sentence

may be imposed. *Shannon v. United States*, 512 U.S. 573, 579 (1994); *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."). The court will therefore deny the motion and will exclude such evidence pursuant to Fed. R. Evid. 403. *See Shannon*, 512 U.S. at 579 ("providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion"). The statute cited by defendant (1 U.S.C. § 112) in support of admission of this evidence is unavailing. That provision only makes clear that U.S. Statutes at Large are proper evidence of the laws contained therein; it says nothing about whether admission of such evidence is relevant or proper in a particular case.

3. Defendant's Motion to Suppress search of computers, cell phones, and iCloud accounts (Dkt. 99). Defendant moves to suppress evidence found in computers and cell phones searched by the Government pursuant to judicial warrants. He also challenges a search of iCloud accounts conducted by Apple pursuant to a court order. Defendant argues that warrants authorizing such searches "must not only specify the information to be seized with particularity in addition to the probable cause to do so, but also must sufficiently describe the search methodology the government plans to employ to lawfully execute the search." Dkt. 99 at 2 (*citing In re Nextel Cellular Telephone*, No. 14-MJ-8005-DJW, 2014 WL 2898262 (D. Kan. June 26, 2014). Defendant contends the computers and phones "were separately examined all absent any colorable limits of

particularity." Dkt. 99 at 2. He argues that the warrants authorized prohibited general searches because they failed to place any limits on the scope of the searches.

The Tenth Circuit recently summarized the relevant law in finding that a warrant authorizing a search of a cell phone failed to meet the particularity requirement of the Fourth Amendment:

> In protecting against unreasonable searches and seizures, the Fourth Amendment mandates two requirements for search warrants: a warrant must be supported by probable cause, and it must describe with particularity "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). Because the Fourth Amendment by its terms "requires particularity in the warrant, not in the supporting documents," an application for a warrant which meets the particularity requirement "does not save the warrant from its facial invalidity." *Id.* (emphasis removed). And "[a]lthough an executing officer's knowledge may be a curing factor," knowledge alone is insufficient to satisfy the particularity requirement. *United States v. Williamson*, 1 F.3d 1134, 1136 (10th Cir. 1993).
>
> In the context of cell phones and cell phone data, the Supreme Court recently held in *Riley v. California* that a warrant is generally required to search digital information on a cell phone, even when the phone is seized incident to a lawful arrest. ––– U.S. ––––, 134 S.Ct. 2473, 2493, 189 L.Ed.2d 430 (2014). We have not yet had occasion to address the effect of *Riley*, but we have previously recognized the importance of the particularity requirement as it pertains to searches of personal computers, because computers "can contain (or at least permit access to) our diaries, calendars, files, and correspondence" and therefore may be "especially vulnerable to a worrisome exploratory rummaging by the government." *United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013).
>
> We have thus drawn a "recognizable line" in considering how much particularity is required for computer searches. *Id.* On the one hand, we have invalidated warrants authorizing computer searches "where we could discern no limiting principle: where, for example, the warrant permitted a search of ' "any and all" information, data, devices, programs, and other materials,' " or "all computer and non-computer equipment and written materials in [a defendant's] house." *Id.* at 1164–65 (first quoting *United States v. Otero*, 563 F.3d 1127, 1132–33 (10th Cir. 2009); then quoting *Mink v. Knox*, 613 F.3d 995, 1011 (10th Cir. 2010)). On the other hand, we

> have stated, "warrants may pass the particularity test if they limit their scope either 'to evidence of specific federal crimes or to specific types of material.' " *Christie*, 717 F.3d at 1165 (quoting *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) (alteration incorporated)).
>
> This approach can be extended to searches of cell phones, which the Supreme Court has characterized as "minicomputers that also happen to have the capacity to be used as a telephone." *See Riley*, 134 S.Ct. at 2489. And here, we have little difficulty concluding the warrant on which Deputy Wilson relied to search Russian's phones was invalid for lack of particularity [footnote omitted]. Although the application requested authorization to search the two Samsung cell phones law enforcement had seized at the time of Russian's arrest and certain data that might be found on them, the warrant itself merely authorized a search of Russian's residence and seizure of any cell phones found inside. The warrant did not identify either of the phones that were already in law enforcement's custody, nor did it specify what material (e.g., text messages, photos, or call logs) law enforcement was authorized to seize.

*United States v. Russian*, 848 F.3d 1239, 1244–45 (10th Cir. 2017).

Defendant does not claim probable cause was lacking to seize and search his cell phones, computers, and email accounts, for evidence of the offenses listed in the warrants. Those offenses included possession and distribution of controlled substances (21 U.S.C. § 841), conspiracy to distribute controlled substances (21 U.S.C. § 846), and money laundering (18 U.S.C. §§ 1956, 1957). And a review of the warrants and their attachments shows the magistrates had a substantial basis for finding probable cause to believe evidence of the specified offenses would be found on these devices and accounts. *See United States v. Haymond*, 672 F.3d 948, 958 (10th Cir. 2012) (in reviewing the magistrate's determination, the court only asks whether, under the totality of the circumstances, the magistrate had a substantial basis for determining that probable cause exists).

The warrants authorizing searches of defendant's residence and Ridge Road office both identified the properties to be searched, by address, and further specified that probable cause existed to search and seize the property identified in "Attachment A and Patient List Attachment." The warrant authorizing a search of defendant's iCloud account similarly identified three particular email accounts, as well as any iCloud account associated with defendant's name, and said that probable caused existed to search and seize the property in "attachment 'A'".

An examination of these attachments shows they met the specificity requirement as explained in *Christie* and other Tenth Circuit cases. For example, the attachment to the warrant to search defendant's residence specified that the items to be seized included (among others) records evidencing purchase, receipt, distribution and prescribing of controlled substances by Dr. Henson; electronic communications documenting the association of the alleged co-conspirators; computers (including lap top computers and storage devices) "that may have been used as a means of storage for 'records', 'documents', and 'information' maintained in violation of 21 U.S.C. §§ 841 and 846," with the quoted terms referring to "all of the items described in this search warrant, in whatever form … they may have been created or stored"; financial records showing payment and receipt of money or accounts receivable; drug distribution or customer lists; documents showing names, addresses, and telephone numbers of patients and associates; all electronic records and files relating to controlled substances for the patients identified in the attachment; and billing records for the identified

patients. *See United States v. 7002 W. Clearmeadow Circle*, *Wichita, Kansas,* No. 15-mj-6195-KGG, Dkt. 2.

These were not warrants to search for "any and all information" or "all computer information" in defendant's house. *See Christie*, 717 F.3d at 1165. Rather, the attachments effectively limited the scope of the searches to material relevant to specific federal crimes. *Id*. The warrants and attachments put officers on notice they were authorized to seize and search the devices for specified types of materials pertaining to the identified offenses. In *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009), the Tenth Circuit noted that "'a computer search may be as extensive as reasonably required to locate the items described in the warrant' based on probable cause." (citation omitted). Given the nature of the offenses alleged, there was necessarily a broad scope of relevant material, but the warrant cannot be faulted for failing to specify the items to be searched, the nature of the materials sought, or the object of the searches. In fact, defendant fails to explain how the warrants could have been more particular in authorizing a search that encompassed all of the potentially relevant records within defendant's computers, cell phones, and internet accounts.

Warrants are to be governed by practical, rather than technical considerations. *See Burgess*, 576 F.3d at 1094 ("it is folly for a search warrant to attempt to structure the mechanics of the search…. One would not ordinarily expect a warrant to search filing cabinets for evidence of drug activity to prospectively restrict the search to 'file cabinets in the basement' or to file folders labeled 'Meth Lab' or 'Customers.'"). While a general search with no limitations is prohibited, officers cannot be expected to accurately

predict the precise form and content of digital storage devices. The attachments to the warrants in this instance spelled out the legitimate objects of the search and the types of relevant materials sought. "Even a warrant that describes the items to be seized in broad or generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988). The court concludes that the warrants were sufficiently particular given the nature of the offenses.

Even if the warrants failed to properly limit the scope of the searches, the court finds any such error does not require suppression of evidence. "Even if a warrant is facially invalid, the reviewing court 'must also review the text of the warrant and the circumstances of the search to ascertain whether the agents might have reasonably presumed it to be valid.'" *United States v. De La Torre*, 543 F. App'x 827, 829 (10th Cir. 2013) (quoting *United States v. Leary*, 846 F.2d 592, 607 (10th Cir. 1988)). Evidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring v. United States*, 555 U.S. 135, 143 (2009) (citation omitted). These warrants (and the attachments) were not so facially deficient as to preclude reasonable reliance upon them. A reasonable officer could conclude that the searches were lawful because the attachments indicated the objects of the searches and also indicated the types of evidence relevant to the offenses listed, thus implicitly limiting the scope of any search. Moreover, as indicated in the *Russian* opinion, supra, Fourth Amendment law in the digital age is still evolving, and the contours of

permissible cell phone and computer searches have not been fully clarified by the courts. The officers executing these warrants had reasonable grounds to believe the warrants were valid. The court thus finds the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984) applies and requires denial of the motion to suppress.

4. Government's Motion in Limine (Dkt. 114). The court grants the Government's request to limit the number of character witnesses called by the defense. No more than five character witnesses will be allowed without a further showing of necessity. The court also grants the Government's request to exclude as irrelevant any testimony from defendant's expert witness, Dr. Carol Warfield, concerning the "chilling effect" that DEA enforcement of the Controlled Substances Act may have on the practice of medicine. The court grants the Government's motion to exclude any testimony about acquittals or convictions in cases in which Dr. Warfield has testified. This does not preclude Dr. Warfield from explaining to the jury that she has testified in prior cases as an expert witness.

5. Government Motion to Admit Rule 404(b) Evidence (Dkt. 120). Based on the Government's representation that the request is withdrawn, the court will deny this motion as moot.

6. Government Motion in Limine to Exclude Expert Testimony (Dkt. 130).

The Government moves to exclude testimony by the defense expert, Dr. Carol Warfield. It argues that Dr. Warfield only reviewed the report of the Government's expert and did not review any patient files, law enforcement reports, or autopsy reports. It contends her testimony is irrelevant because she offers only general opinions

without any relation to the facts of the case, such that her opinions are not relevant and would not be helpful to the jury. Dkt. 130. In response, the defendant argues that Dr. Warfield was provided with the same materials as the Government's expert, and asserts that "[t]he simple fact that the Government dislikes Dr. Warfield's opinions is no reason to ask this Court to disallow her very helpful opinions in aiding the jury in determining the ultimate questions in this case." Dkt. 183 at 2.

Under Fed. R. Evid. 702, district courts must determine whether a witness is qualified by knowledge, skill, experience, training, or education to offer expert testimony. If that requirement is met, the court must assess whether the testimony is reliable, which is determined by considering 1) whether it is based on sufficient facts or data; 2) whether it is the product of reliable principles and methods; and 3) whether the expert has reliably applied the principles and methods to the facts of this case. *United States v. Chapman*, 839 F.3d 1232, 1238 (10th Cir. 2016). Such evidence is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). *See also Griffeth v. United States*, 672 F. App'x 806, 814 (10th Cir. 2016).

Dr. Warfield's CV shows that she is qualified to express medical opinions concerning the usual course of professional practice in the treatment of pain. Some of the opinions set forth in her report additionally appear to meet the standards for relevance and reliability, although others do not. The court cannot make a final determination of admissibility based on the report alone, but makes the following preliminary determinations.

Dr. Warfield expresses opinions that various acts allegedly done by the defendant – including taking cash payments, providing large doses of pain medication, and not obtaining medical records or performing physical exams – were not prohibited by any regulations or guidelines governing the appropriate standard of medical care. *See* Dkt. 130-2, items 1-14. With respect to these opinions, Dr. Warfield was not asked to examine, and did not offer an opinion, as to whether defendant's treatment of any particular patient met the standard of care or whether any particular prescription was issued within the usual course of medical practice. This fact certainly limits the helpfulness of such opinions. But these general opinions are based on Dr. Warfield's knowledge and experience in the field, they bear sufficient indicia of reliability, and such testimony could be helpful to the jury, in light of other evidence, in determining whether defendant issued prescriptions without a legitimate medical purpose and outside the usual course of professional practice.

Other opinions appear to fail the basic test of relevance or do not appear to be based on any reliable method. The items numbered 15-18 (Dkt. 130-2 at 3-4) contain opinions that are not tied to any facts or patients involved in this case. These include opinions such as "there are a variety of legitimate reasons why a patient may need more medication than what was prescribed"; prescribing a dangerous combination of drugs "may be very appropriate for certain patients"; and no screening tools "can reliably prevent the tragic death of a patient who does not take the medications as prescribed." Absent evidence tying these opinions to particular patients treated by Dr. Henson, such opinions would not be helpful to the jury in determining whether Henson's actions

were in fact for a medical purpose and within the usual course of practice. Such opinions would simply invite speculation by the jury, and will be excluded under Rule 702.

Dr. Warfield's additional discussion of the standard of care (Dkt. 130-2 at 4, last paragraph) is similarly inadmissible. Her opinion that "there is no reliable way to determine if any one patient will be or is abusing or diverting drugs," and her apparent conclusion that this means prescriptions should never be withheld because of indications of abuse or diversion, are unsupported by any reference to authority or discussion of relevant factors. The source of these opinions is unclear, but they ignore the legal duty of a physician to avoid diversion of controlled substances, they fail to address whether the medical profession generally recognizes indicators of abuse or diversion, and fail to discuss whether the usual course of practice calls for refusing to prescribe controlled substances when indications of abuse or diversion are present. *See United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (experience alone may qualify a witness as an expert, but the witness still must explain how her experience is sufficient to lead to a conclusion based on the facts of the case). The Government's motion is accordingly granted in part and denied in part.

7. Defendant's Motion to Suppress Statements (Dkt 151). Defendant contends that when agents executed the search warrant at his residence on August 7, 2015, they interrogated him under "hostile circumstances that necessitated *Miranda* warnings." Dkt. 151 at 4. No such warnings were given, and defendant argues that any statements he made in the course of the interrogation should be suppressed.

"*Miranda* warnings are required only when the person questioned 'has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Washington v. Roberts*, 846 F.3d 1283, 1294 (10th Cir. 2017) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977)). For these purposes, "custody" is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). In determining whether a person is in custody in this sense, the first step is to ascertain, in light of the objective circumstances of the interrogation, whether a reasonable person would have felt he was not at liberty to terminate the interrogation and leave. *Id*. at 509 (citations and punctuation marks omitted). Courts examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Id.* (citations omitted).

Determining whether an individual's freedom of movement was curtailed is only the first step in the analysis, and is not accorded "talismanic power." *Howes*, 565 U.S. at 509 (citing *Berkemer v. McCarty*, 468 U.S. 420, 437 (1994)). The court additionally asks "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id*.

The court finds the following facts from the evidence presented at the hearing. A number of agents arrived at defendant's residence (7002 W. Clearmeadow Circle in Wichita) around 5 p.m. on August 7, 2015, armed with a search warrant. They had

defendant under surveillance and timed their arrival to coincide with defendant's arrival from the airport. Defendant arrived in a taxi because his wife was at home and was not feeling well. Several agents, including DEA Special Agent Michael Holder, approached defendant as he was getting out of the cab and informed him who they were and that they were there to execute a search warrant. There were about a dozen or so agents from various agencies at the house or in cars nearby. After defendant paid the cab driver, Holder patted defendant down for weapons before the group walked up to the front door of the house. The agents seized defendant's cell phone from him.

Early on in the encounter, defendant asked if he was under arrest. Holder told him he was not. Holder asked defendant if he had the keys to open the front door; defendant said his wife was at home and would let them in. After some delay, defendant's wife opened the door. The agents and defendant entered, explaining to defendant's wife why they were there. One of the agents carried defendant's luggage into the house.

Holder and DEA task force officer Mikeal Long escorted defendant to a living room as other agents went room-to-room with weapons drawn throughout the house, "clearing" it to make sure no one else was inside. Agents initially took defendant's wife to another room, where she spoke with an agent, but she subsequently was brought back into the same room with defendant. Defendant's wife was not feeling well and she rested on a couch.

After the house was secured, DEA Diversion Investigator Patricia O'Malley entered, and Holder explained that O'Malley was a DEA investigator who wanted to

talk to defendant about his DEA registration. Holder told defendant he did not have to answer those questions and could talk to an attorney if he wanted to. Holder also told him if he wanted to leave, he was free to do so, but that if he left he would not be allowed back into the house until the search was completed. Defendant said he understood and wanted to cooperate. He never asked to leave. He was not handcuffed and no weapons were ever pointed at him. Agents spoke to him in a normal tone and did not threaten him. At most, they indicated that if he remained in the house, he could not roam around but needed to stay in the front living room.

O'Malley told defendant she intended to seek an emergency administrative suspension of his DEA registration number based on a belief that he was a danger to public health. She produced and explained a DEA form under which he could voluntarily surrender his DEA number. Defendant agreed to sign the form and did so.

Holder asked defendant various questions about his medical practice, including about his storage of patient records and how he treated patients. Defendant answered the questions. He told Holder that some patient files were on a laptop computer that had been stolen earlier in the year, but that he kept paper files for his patients at his clinic on Rock Road. Unbeknownst to defendant, agents had a warrant and were then searching the Rock Road clinic at that time. They found no patient files.

Defendant spoke to agents for about twenty minutes. After that, he asked if he could talk to an attorney, and was allowed to use his wife's phone to make several calls. The agents ceased questioning him at that point. He was allowed to move about the living room as he made calls.

The search of defendant's residence took about four hours. Several hours into the search, supervising DEA agent Todd Hixson entered the living room to relieve another agent. Hixson could see defendant talking on the phone. Defendant told Hixson that his attorney was on the phone and wanted to ask Hixson a question. Hixson refused to take the call. A short time later, Hixson noticed that defendant was speaking on the phone in a hushed voice and had wandered over to the front window, where he was looking out. Hixson saw several Wichita police cars outside, with officers coming toward the front door, and he realized that defendant had called the police. Hixson was angry at defendant for having created a potentially dangerous situation and told him to "sit down and shut the fuck up" (or words to that effect). Hixson was particularly concerned because, due to the extreme heat of the day, agents had removed their vests with police markings, meaning the police would not recognize them as law enforcement officers. Hixson was able to intercept the police and explain that he and the others were DEA agents executing a search warrant.

The Government played a recording of the 911 call defendant made to the police. It showed that defendant told the dispatcher that a group of armed men had forced their way into his house, that they were going through the house taking his things, and that someone was injured. Only toward the end of the call did he briefly mention that the men claimed to be DEA agents.

Defendant testified at the hearing. Among other things, he claimed that Holder told him he was going to jail for a long time and that he didn't need an attorney, that defendant asked to speak to his attorney but wasn't allowed to use the phone, and that

in response to a statement to Holder that he was going to take his wife and leave, Holder responded, "sit down and shut the fuck up." Defendant claimed he made the 911 call on the advice of his attorney.

The totality of the circumstances shown by the evidence makes clear that defendant was not in custody for purposes of *Miranda* when he was questioned. As is clear from *Michigan v. Summers*, 452 U.S. 692 (1981), agents executing the search warrant had authority to detain defendant while they searched the house. The agents told defendant at the outset of the encounter that he was not under arrest. They informed him prior to questioning that he was free to leave, did not have to answer questions, and could contact an attorney. The questioning took place in defendant's home, was of limited duration, and involved no restraint or coercive techniques that would call into question the voluntariness of defendant's decision to stay and answer questions. Defendant was not arrested after questioning or after the search was completed. The officers were polite and non-threatening during questioning. The only flash of anger came after questioning was completed, when Hixson realized defendant had created a dangerous situation by calling the police.

Insofar as defendant's testimony conflicted with that of the agents -- such as whether he was told he could leave or the point at which he was told to sit down -- the court finds the agents' testimony was more credible. This finding is due in part to defendant's clear misrepresentations during the 911 call, in which he led the dispatcher to believe that unknown armed men had forced their way into his home to rob him, and that someone had been injured, when defendant clearly knew otherwise. The evidence

also suggests defendant falsely told the officers that he kept his patient files in his Rock Road office. For these reasons and others, the officers who testified were more credible than the defendant.

In sum, the court finds that a reasonable person in defendant's circumstances would have felt free to terminate the interrogation and leave. In fact, defendant was expressly informed that he could do so. Defendant is a medical school graduate who clearly understood the situation. There is no credible evidence of improper coercion calling into question defendant's voluntary decision to stay and answer questions. Defendant's motion to suppress is accordingly denied.

8. Defendant's Motion for James Hearing (Dkt. 152). Following the Government's announcement that it would not use any co-conspirator hearsay at trial, defendant withdrew his request for a *James* hearing. Accordingly, this motion is denied as moot.

**IT IS THEREFORE ORDERED** this 22nd day of June, 2017, that defendant's Motion in Limine (Dkt. 97) is DENIED as moot; defendant's second Motion in Limine (Dkt. 98) is DENIED; defendant's Motion to Suppress (Dkt. 99) is DENIED; the Government's Motion in Limine (Dkt. 114) is GRANTED; the Government's Motion to Admit Rule 404(b) Evidence (Dkt. 120) is DENIED as moot; the Government's second Motion in Limine (Dkt. 130) is GRANTED IN PART and DENIED IN PART as stated in this order; defendant's Motion to Suppress Statements (Dkt. 151) is DENIED; and defendant's Motion for *James* Hearing (Dkt. 152) is DENIED as moot.

___s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE